Filed 10/7/25  Long Beach Unified School Dist. v. City of Long Beach CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| LONG BEACH UNIFIED SCHOOL DISTRICT,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>CITY OF LONG BEACH, ET AL.,<br><br>　　　Defendant;<br><br>A&S ENGINEERING, INC., ET AL.,<br><br>　　　Real Parties in Interest and Appellants. | B341444<br><br>(Los Angeles County Super. Ct. No. 22STCP04170) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Joel L. Lofton, Judge.  Affirmed.

Orbach Huff & Henderson LLP, Philip J. Henderson, Stan M. Barankiewicz II, Sarine A. Abrahamian, Tempestt L. Tatum, and Philip A. Brody for Plaintiff and Respondent.

Jeffer Mangels Butler & Mitchell LLP, Matthew D. Hinks and Julia Consoli-Tiensvold for Real Parties in Interest and Appellants.

———————————————

The City of Long Beach (the City) approved a construction project proposed by A&S Engineering, Ahmad Ghaderi, Bliss Car Wash, LLC, and David Delrahim (collectively, appellants) without requiring a full review under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA) and applicable regulatory guidelines (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines)). The proposed project, a self-automated car wash, would be adjacent to the playgrounds of Dooley Elementary School (Dooley), which is owned and operated by the Long Beach Unified School District (the District). The project site is located within the 90th percentile, or the top ten percent, of the most pollution burdened areas in the state. There are already four gas stations, one car wash, and one operating drive through (for fast food) within 500 feet of the school. The City found that the project was exempt from CEQA and approved the project. The District petitioned the trial court for a writ of mandate to set aside the City's approval. The court granted the petition.

We find that the City abused its discretion in two respects. First, the City failed to consider the District's substantial evidence that the project would have a cumulative impact on air

2

quality.  Second, to the extent the City implicitly found no reasonable possibility of a significant environmental impact, the record does not support that finding, as none of the other evidence considered the cumulative impact on air quality. Therefore, we affirm the judgment.

FACTUAL BACKGROUND

## I.  The Project

Appellants seek to add a self-automated car wash to an existing service station and mini mart located at 5005 Long Beach Boulevard in Long Beach, California.  The project would be in a vacant lot at the intersection of two major commercial thoroughfares in Long Beach, roughly one-half mile east of the interstate 710 freeway.

On its north and west sides, the proposed project site is bordered by "the playground areas" of Dooley, which is owned and operated by the District.[1]  The "mini mart and gas station abut[] the northerly property line shared with the . . . school[.]"  A second gas station sits across the street to the east.  A third gas station "with a drive-through car wash and mini mart is located catty-corner to the site across" the street to the southeast.  There is also a fourth gas station and a drive through for fast food located within 500 feet of Dooley.[2]

Appellants initially sought "to construct and operate a new 3,058-square-foot detached self-service automated car wash"

---

[1] The District cites evidence that approximately 72 precent of Dooley's students are classified as "financially disadvantaged." We do not rely on this evidence in deciding this appeal.

[2] There is a drive through for a pharmacy but it was closed during the relevant time period.

3

capable of processing up to eight vehicles at a time. Appellants estimated "that 369 vehicles would pass through the car wash per day." The project would also include "15 vacuum parking spaces" situated next to the adjacent gas station and mini mart.

## II.    Preliminary Environmental Studies

Between March 2020 and August 2020, appellants commissioned a series of studies assessing the project's impact on noise levels and air quality.

The City obtained an independent review of appellants' studies (the LSA report). With respect to air quality, the LSA report found that appellants' study "[did] not include enough information to determine the air quality impacts of the project." In particular, LSA opined that because "[t]he project site is located in an area identified by the [state] as currently affected by many sources of pollution and where people are often especially vulnerable to pollution's effects[,] . . . . a cumulative analysis of existing sources of pollution in the project vicinity should be provided."

In response, appellants provided the City with updated studies. As relevant here, a June 2021 study found that the project would have a "[l]ess than significant impact" on local air quality. The study acknowledged that, per the California Office of Environmental Health Hazard Assessment, "the project site is located within the 90th percentile or top 10 percent for the most pollution burdened" in the state.[3] However, the study found that

_____

[3] Appellants' study states: "The project site is located within the 90th percentile or top 10 percent for the most pollution burdened, as outlined in Map LU-6 of the City's updated Land Use Element (City of Long Beach 2019a)." We interpret this statistic as referring to the state, not the City. The map is

4

because the project's "operational criteria pollutant emissions would not exceed [state regulatory] regional thresholds for criteria pollutants[,] . . . . [its] impacts would be less than significant."

The June 2021 study purported to analyze the project's cumulative impact on air quality, given the existing developments and high pollution levels. However, despite noting that "[t]he project would contribute particulate matter and . . . ozone precursors"[4] during both construction and operation, the study only evaluated the "cumulative[] . . . amount of pollutants from *construction* emissions." (Italics added.)

## III. The City Denied a Conditional Use Permit

On March 17, 2022, the City's Planning Commission denied appellant's application for a conditional use permit, citing lingering concerns about the project's impacts on the school. The Planning Commission primarily focused on noise and traffic issues, but also feared that the project "w[ould] intensify the auto-oriented land uses adjacent to [the] school . . . . Automobile-oriented uses currently exist on all four corners of the [relevant] intersection, and the proposed project further intensifies these uses on the subject site." Despite the June 2021 study, the staff

---

derived from a state agency that assesses "pollution burden and vulnerability of populations by census tract." Moreover, the map itself includes areas beyond the City's limits and appears to have been "cut and pasted" from a larger map, which necessarily means the statistic is not limited to the City. Regardless, our decision would be the same even if this statistic is limited to the City.

[4] Children are particularly sensitive to the health risks posed by these pollutants.

remained concerned about students' "cumulative exposure to pollutants[,]" which has a documented "negative impact on neurodevelopment."

## IV.    Appellants Appealed to the City Council

Appellants appealed the Planning Commission's decision to the City Council.  Pending a hearing before the City Council, appellants redesigned the project to further mitigate noise and traffic impacts on the school.  Among other things, the redesign expanded the car wash to 3,464 square feet and increased its processing capacity from eight to eleven cars at a time.  Appellants commissioned a new noise study reflecting these changes, dated July 28, 2022.  However, appellants did not provide new air quality or traffic studies following the expansion.

## V.    The City Approved the Project

On August 16, 2022, the City Council took up appellants' appeal.  When discussing the merits of the appeal, the Council primarily focused on the economic and social benefits of the project, only briefly noting that appellants' studies showed "no significant noise or air quality impacts from this project[.]"  The Council then voted unanimously to find that "the project has been determined to be categorically exempt" from CEQA review.  The Council "direct[ed] [City] staff to return . . . findings in support of [its] action[.]"

Per this directive, the Planning Commission returned new findings.  As relevant here, it found that the project was exempt from full CEQA review under Class 3 (Guidelines, § 15303; small projects) and Class 32 (Guidelines, § 15332; urban infill developments), and that no exceptions precluded the application of those exemptions.  As to the cumulative impact exception (Guidelines, § 15300.2(b)), the Commission cited the appellants'

6

first August 2020 air quality study for its "conclu[sion] that the project would not exceed established CEQA thresholds" on air quality "to constitute an impact on the surrounding environment[.]"  The Commission noted that "[t]here are no projects in the vicinity of the project site that would result in cumulative impact with respect to traffic, noise, water quality and utilities and public services."[5]

On November 15, 2022, the City Council reconvened to consider the matter in light of the Planning Commission's new findings.  The District appeared and objected to the proposed approval of the conditional use permit.  In support of its position, the District submitted an independent review of appellants' environmental studies (the Chambers Report).

With respect to air quality, the Chambers Report concluded that appellants' June 2021 study "did not consider the cumulative effect on the surrounding community the [p]roject would have when combined with . . . existing use[s][,]" despite indications that the project would compound the environmental impacts caused by nearby businesses.  For example, the report noted that increased use of nearby gas stations, located "approximately 150[] [feet] to 185[] [feet] from the school's playgrounds[,]" "would in effect increase Benzene emissions generated by [those] . . . [gas] station[s][.]"

The Chambers Report observed that the gas station immediately abutting the project site has 12 fuel dispensers and a minimart; using trip generation models, the report predicted that the site currently experiences 3,870 daily trips (or 1,935 vehicles).  Appellants predicted that the project would add

---

[5] The Planning Commission did not make a similar finding with respect to air quality.

7

another 738 daily trips (or 369 vehicles).  The Chambers Report found that "if as [few] as 50[] [percent] of" carwash patrons were to refuel nearby, "the estimated yearly fuel" output of the nearby gas stations "would exceed 3.6 million gallons," the safety threshold for fuel output within 300 feet of a school (recommended by the California Air Pollution Control Officers Association (CAPCOA)).[6]

Over the District's objections, and without discussion of the issues raised by the Chambers Report, the City Council voted to adopt the staff's findings, approve the project, and issue the conditional use permit.  On November 29, 2022, the City filed a CEQA Notice of Exemption finding that the project was categorically exempt under Class 3 and Class 32, and that "[a]pproval of the project would not result in any significant effects related to traffic, noise, air, or water quality."

## PROCEDURAL BACKGROUND

On November 22, 2022, the District filed a petition for writ of mandate seeking to vacate the City's approval of the project. The petition alleged, inter alia, that the City violated CEQA by determining that the project was categorically exempt and that no exceptions applied.  The City and appellants filed a joint opposition.

On September 23, 2024, the trial court entered judgment in favor of the District.  The court upheld the City's finding that the project was exempt from full CEQA review under Class 3.[7]

---

[6] The Chambers Report estimated that fuel output could increase to as much as 8.4 million gallons per year.

[7] The trial court found that the project was not exempt under Class 32.

8

However, the court also found that regulatory exceptions—including the cumulative impact exception (Guidelines, § 15300.2(b))—precluded application of the Class 3 exemption. The court thus directed the City to (1) set aside its approval of the project, along with all supporting findings; and (2) direct appellants to comply with CEQA before proceeding with the project.

Appellants timely appealed.

## DISCUSSION

### I. General Standard of Review

"Appellate review under CEQA is de novo in the sense that we review the agency's actions as opposed to the trial court's decision." (*North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 849.) We review the City's decision to determine whether it prejudicially abused its discretion. (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 214–215 (*Center for Biological Diversity*).) A city abuses its discretion if it " 'has not proceeded in a manner required by law or if [its] . . . decision is not supported by substantial evidence.' [Citation.]" (*Id.* at 215.) "We exercise our independent judgment to determine whether the agency employed proper procedures and review the agency's factual findings for substantial evidence." (*Arcadians for Environmental Preservation v. City of Arcadia* (2023) 88 Cal.App.5th 418, 428 (*Arcadians*).)

### II. Regulatory Framework

CEQA "establishes a comprehensive scheme to provide long-term protection to the environment. It prescribes review procedures a public agency must follow before approving or carrying out certain projects. For policy reasons, the Legislature

9

has expressly exempted several categories of projects from review under CEQA." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1092 (*Berkeley Hillside*).) However, a project that is categorically exempt may nonetheless require review under CEQA if it falls within one of several exceptions to the exemptions. (*Robinson v. City & County of San Francisco* (2012) 208 Cal.App.4th 950, 956.)

## III.   The Class 3 Exemption Applies to the Project

The City found that the project, which, in its latest incarnation, called for the construction of a 3,464 square foot carwash, is exempt under Class 3. This exemption applies to new commercial construction in urbanized areas that is smaller than 10,000 square feet and meets other specified conditions. (Guidelines § 15303, subd. (c).) The District does not challenge this finding on appeal. Accordingly, the District concedes that the project is exempt under Class 3.[8] (See *E.I. v. El Segundo Unified School Dist.* (2025) 111 Cal.App.5th 1267, 1289 [Issues not raised or supported by argument or citation to authority are waived].)

## IV.   The Cumulative Impact Exception Precludes Application of the Class 3 Exemption

### A.   *Relevant Regulations*

The "cumulative impact" exception applies "when the cumulative impact of successive projects of the same type in the same place, over time is significant." (Guidelines, § 15300.2,

---

[8] If a project is exempt under one categorical exemption, the reviewing court need not consider other potential exemptions. (*CREED-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 513.) Therefore, we do not address the parties' arguments concerning the applicability of the Class 32 exemption.

10

subd. (b).) " 'Cumulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (Guidelines § 15355.) This exception requires the City to review and consider the effects of the project in context with other projects of the same type in the same location. (See *Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 703.) The reason for this is clear: "One of the most important environmental lessons that has been learned is that environmental damage often occurs incrementally from a variety of small sources. These sources appear insignificant when considered individually, but assume threatening dimensions when considered collectively with other sources with which they interact." (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 114, disapproved on another ground in *Berkeley Hillside*, *supra*, 60 Cal.4th at 1109, fn. 3.)

  B. *Standard of Review*

  The standard of judicial review applicable to the cumulative impact exception is not as well settled as other CEQA exceptions. (*Aptos Residents Assn. v. County of Santa Cruz* (2018) 20 Cal.App.5th 1039, 1048 (*Aptos*).) Historically, the "three general exceptions" to CEQA exemptions—including the cumulative impact exception and the more commonly cited unusual circumstances exception (Guidelines, § 15300.2, subd. (c))—have been governed by the same standard of review. (*Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, 855 (*Hines*).) Prior to the California Supreme Court's decision in *Berkeley Hillside*, appellate courts were split between two different standards. (*Hines*, *supra*, 186 Cal.App.4th at pp. 855–

11

856.) Some courts adopted a standard that was more favorable to parties challenging categorical exemptions. These courts held that a categorical exemption could not be utilized if there was a " ' "fair argument " ' " based upon substantial evidence that the project will have significant environmental impacts, even in the face of substantial evidence to the contrary. (*Id*. at p. 856.) Other courts applied an ordinary " 'substantial evidence test,' " i.e., whether the decision was supported by substantial evidence in the record, deferring to the express or implied findings of the local agency. (*Ibid*.; see also *Dehne v. County of Santa Clara* (1981) 115 Cal.App.3d 827, 837.)

In *Berkeley Hillside*, the California Supreme Court resolved the split of authority as to the unusual circumstances exception, adopting a bifurcated standard of review that combines elements of both approaches. (*Berkeley Hillside, supra*, 60 Cal.4th at p. 1114.) The Court did not expressly determine whether the same standard applies to the other general CEQA exceptions. However, appellate courts faced with the cumulative impact exception have addressed this issue by adopting *Berkeley Hillside*'s bifurcated standard of review. (*Aptos, supra*, 20 Cal.App.5th 1039, 1048 [concluding that "a similar standard of judicial review applies to all three [general] exceptions"]; *Arcadia, supra*, 88 Cal.App.5th at p. 439 [applying *Berkeley Hillside* to a cumulative impact inquiry].) Appellants argue that we should do the same here, and Respondents argue that we should apply the fair argument standard. Because our decision would be the same under either approach, we assume without deciding that *Berkeley Hillside*'s bifurcated standard of review applies to the cumulative impact exception.

12

We first determine whether there is substantial evidence of the existence of a cumulative impact on the environment. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1114; see also *Aptos*, *supra*, 20 Cal.App.5th at pp. 1048–1049.)  This is "an essentially factual inquiry."  (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1114.)  If so, the City was obligated to "apply the fair argument standard [to] determin[e] whether 'there is a reasonable possibility [of] a significant effect on the environment' " caused by that cumulative impact.  (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1115.)  "[T]he reviewing court's function 'is to determine whether substantial evidence support[s] the agency's conclusion as to whether the prescribed "fair argument" [of a significant impact] could be made.'"  (*Ibid.*; see also *Aptos*, *supra*, 20 Cal.App.5th at p. 1049.)

C.     *The District Produced Substantial Evidence of a Cumulative Impact on Air Quality*

At the City's final hearing before approving the project, on November 15, 2022, the District submitted a letter outlining its concerns, as well as the Chambers Report.  In its letter, the District states: "Chambers explained that increased vehicle visits to the car wash could cause an increase in Benzene emissions: '[I]ncreas[ed] Benzene emissions generated by the existing fueling station and cumulatively (Existing plus project) may increase incremental risks (Acute, Chronic or Cancer) from the gas station operations to levels considered significant in the State of California and the City of Long Beach with the Project addition.' [Citation].  Importantly Chambers explained that the gas station collocated with the car wash could increase to dispensing up to 8.4 million gallons of gasoline annually, where it is recommended that gas stations exceeding 3.6 million gallons per year not to be located within 300 feet of a school.  [Citation]."

The Chambers Report itself found as follows: (1) The existing site is a gas station with 12 dispensers and a minimart; (2) Trip generation models predict 3,870 daily trips or 1,935 vehicles for the existing site; (3) The addition of the car wash will add 738 daily trips or 369 additional vehicles; (4) A "significant portion" of these additional vehicles will also use the gas station; (5) These patrons would effectively increase Benzene emissions generated by the existing gas station; (6) Benzene is known to cause health risks; (7) Accordingly, CAPCOA recommends that gas stations capable of having a throughput of 3.6 million gallons per year should be located over 300 feet from schools; (8) The throughput for the 1,935 existing vehicles and 369 additional vehicles would be as much as 8.4 million gallons per year; and (9) Even if only 50% of car wash patrons get gas daily, the estimated yearly fuel would still exceed 3.6 million gallons per year.

This constitutes substantial evidence that the project would "compound or increase" the environmental impacts of the nearby automobile-related businesses. It references a specific impact on the environment, *i.e.*, an increase in Benzene emissions based upon additional vehicles in the area, in excess of the recommended CAPCOA threshold of 3.6 million gallons per year, in an area located next to a school and within the 90th percentile of pollution burdened areas in the state. While we agree the Chambers Report is not conclusive, it does satisfy *Berkeley Hillside's* substantial evidence standard.

Appellants contend that the Chambers Report is too speculative to be substantial. We disagree. The expert opinions expressed in the Chambers Report make logical inferences based upon available information. There will necessarily be some uncertainty when considering the impact of a project which does

14

not yet exist.  But because the Chambers Report's inferences are reasonable, logical and not "based *entirely* on speculation[,]" they are sufficient to support the District's position.  (See *Magan v. County of Kings* (2002) 105 Cal.App.4th 468, 477, italics added. (*Magan*); see also Guidelines, § 15384, subd. (a) [" 'Substantial evidence' . . . means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached."].  Put another way, the Chambers Report constitutes substantial evidence of a cumulative environmental impact because it makes inferences that are " ' "a product of logic and reason" ' " that " ' "rest on the evidence," ' " not " ' "mere speculation or conjecture." ' " (*Moran v. Foster Wheeler Energy Corp.* (2016) 246 Cal.App.4th 500, 518, citation omitted.)[9]

Similarly, Appellants argue that the Chambers Report was merely a "peer review" of their June 2021 study (which only

_____

[9] The cases cited by appellants are distinguishable.  (See *Aptos, supra,* 20 Cal.App.5th at p. 1051 [" 'speculation that potential future projects similar to the one under consideration *could* cause a cumulative adverse impact' " is " 'not sufficient to negate a categorical exemption' "]; *Hines, supra,* 186 Cal.App.4th at p. 857 (an appellant cannot rely on potential future development to establish a significant adverse effect on the environment); *Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 701–702 ["Merely listing . . . other projects [] in the area that may cause significant cumulative impacts[,]" without more, "is not evidence" of cumulative impacts]; *Magan, supra,* 105 Cal.App.4th at p. 477 [an appellant's "fail[ure] to support his [cumulative impact] claims with *any* evidence in the record" is fatal to his exception arguments].)  As discussed, the Chambers Report does not suffer from any of the defects identified in these cases.

evaluated the "cumulative[] . . . amount of pollutants from *construction* emissions"). It is true that the Chambers Report notes that the June 2021 study "did not consider the cumulative effect on the surrounding community the Project would have when combined with the existing use." Nevertheless, the Chambers Report does more than review appellants' studies, because it discussed concerns over Benzene emissions, as discussed.

Finally, appellants argue that the District failed to produce evidence that the project would compound the effects of a nearby use that is "of the same type" as the proposed carwash. (Guidelines, § 15300.2, subd. (b).) But, as appellants acknowledge, a nearby use is sufficiently like a challenged project if it "produce[s] related or cumulative impacts[.]" (*Citizens to Preserve the Ojai v. County of Ventura* (1985) 176 Cal.App.3d 421, 429.) The Benzene emissions caused by gas station fuel pumps are closely related to the preozone emissions that, according to appellant's studies, will be generated by the operation of the carwash. Both emissions are chemical pollutants that increase with increased automobile traffic and pose significant health risks, especially to children.

D.     *The Chambers Report Was Not Untimely*

Appellants argue that the Chambers Report was "late." There is no dispute that the District's letter and the Chambers Report were submitted before the hearing, albeit on the same date. Appellants identify no deadline for the submission of evidence; nor did we find one in the record. More important, appellants do not develop any argument that the City could disregard this evidence simply because it was submitted on the same date as the hearing. Therefore, appellants have waived any

16

argument that the Chambers Report was "late."  (See *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 ["Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the issues waived."].)

E.   *The City Abused its Discretion in Applying a Categorical Exemption Based Upon This Record*

Once the District provided this substantial evidence of a cumulative impact on air quality, the City was required to determine whether there was a " 'reasonable possibility' " the car wash would have " 'a significant effect on the environment' " in connection with the nearby uses.  (See *Berkely Hillside*, *supra*, 60 Cal.4th at p. 1115.)  "[A]n agency may not apply a categorical exemption without considering evidence in its files of potentially significant effects . . . .  In other words, an agency must consider whether an exemption is subject to an exception and may not ignore contrary evidence in the record in making that finding." (*Arcadians*, *supra*, 88 Cal.App.5th at p. 438; see also *Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1102 [same].)

The City failed to do so.  On November 15, 2022, the City Council voted to adopt the staff's determination and finding that the project is exempt from CEQA.  However, the staff's report did not consider or even reference the Chambers Report.  Nor did the staff's report consider whether there would be a cumulative impact on *air quality*.  The staff's report found that the project itself would have no significant impact on air quality.  The staff's report further states: "There are no projects in the vicinity of the project site that would result in cumulative impact with respect to traffic, noise, water quality and utilities and public services."

17

This section omits any reference to the lack of a cumulative impact with respect to air quality.

Similarly, the City Council did not appear to consider the Chambers Report and the District's arguments based upon that evidence. The City Council's vote was a few hours after the City received the Chambers Report. The vote was held without any discussion of the new evidence, and without any attempt to seek input from the City's staff.

Finally, to the extent the City implicitly found no reasonable possibility of a significant cumulative environmental impact on air quality, the City abused its discretion. (See *Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1115; see also *Aptos*, *supra*, 20 Cal.App.5th at p. 1049.) As discussed, while not conclusive, the Chambers Report raises concern of a significant cumulative impact relating to air quality. The remaining evidence in the record does not address this concern. The sole piece of evidence cited in the staff's report is appellants' August 2020 air quality study, which is flawed in several respects. The study is outdated, as it predates the expansion of the project's square footage and operating capacity. And the City's own LSA report found that the August 2020 study did not include an analysis of the project's cumulative impact on air quality, despite how important that information would be in assessing the project's impacts on an already over-polluted area.

Nor does the June 2021 air quality study address the concern about air quality raised by the Chambers Report. The June 2021 study also predates the project's expansion, which did not occur until after appellants' 2022 administrative appeal. And while the June 2021 study purportedly assessed the cumulative impacts of constructing *and* operating the project on air quality,

18

its actual analysis was limited to the cumulative impact posed by *construction*.

Because the only other evidence in the record lacks any information about the project's cumulative operational impacts on air quality, it does not support any implicit finding by the City that there will be no significant cumulative environmental impact on air quality. (See Guidelines, § 15384, subd. (a) ["Substantial evidence" requires "enough relevant information . . . that a fair argument can be made to support [the City's conclusion].) Based upon the foregoing, we conclude that the City abused its discretion in finding that the project was exempt from CEQA review. (*Center for Biological Diversity, supra*, 62 Cal.4th at p. 215.) Accordingly, we affirm the judgment.[10]

## DISPOSITION

The judgment is affirmed. The District is entitled to costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
GOORVITCH*

---

[10] Because the cumulative impact exception provides a sufficient basis to affirm the appeal, we need not address the parties' arguments on the unusual circumstances exception. (See *Scott v. City of San Diego* (2019) 38 Cal.App.5th 228, 243.)

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19

We concur:


_____, Acting P. J.
CHAVEZ


_____, J.
RICHARDSON